SHADDUCK *v.* GRAND RAPIDS & INDIANA RAILWAY CO.

1. NEGLIGENCE — PERSONAL   INJURIES — RAILROADS — BURDEN   OF
   PROOF.
   In actions for negligent injuries, the burden of proving
   defendant's negligence and plaintiff's reasonable care is
   on the plaintiff.

2. SAME—FELLOW-SERVANTS—MASTER AND SERVANT.
   Where plaintiff received personal injuries from the giv-
   ing way of a chain and hook, used in moving a heavy
   steel truss, and it appeared that the chain was sufficiently
   heavy and did not break, that if the loosening of the ap-
   pliance was not due to plaintiff's act, it might properly
   be attributed to the negligence of the workman employed
   by the consignees to unload the truss, plaintiff, being a
   teamster for independent contractors, was not a fellow-
   servant of the unloading crew.

3. SAME—VOLUNTEER—CONTRIBUTORY NEGLIGENCE.
   In volunteering to assist the work of unloading and tak-
   ing a crow bar to push the truss onto the wagon with-
   out the request of those in charge for assistance and
   before they could give him warning, plaintiff, who placed
   himself under the load as it was being swung by a der-
   rick, was guilty of negligence contributing to his injury.[1]

4. SAME—MASTER AND SERVANT—PROXIMATE CAUSE.
   Any negligence of which the defendant railway company
   may have been guilty in furnishing an unsuitable chain
   for the purpose of unloading, as a loan to the consignee,
   whose employees knew of its unfit condition and could
   have used it safely, was not the proximate cause of plain-
   tiff's injury.

Error to Kent; McDonald, J.  Submitted November
6, 1913.  (Docket No. 79.)  Decided March 28, 1914.

[1] As to the liability of a master for injury to volunteer, see
notes in 22 L. R. A. 664; 13 L. R. A. (N. S.) 561; and 43 L.
R. A. (N. S.) 187.  On the question who are volunteers, see note
in 16 L. R. A. 861.

Case by Vern Shadduck against the Grand Rapids & Indiana Railway Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed; new trial refused.

*James H. Campbell,* for appellant.

*Charles G. Turner* and *George E. Nichols,* for appellee.

STEERE, J. Plaintiff recovered a judgment against defendant in the circuit court of Kent county for personal injuries sustained by a heavy piece of steel roof truss falling upon him while it was being transferred from a railway car to a wagon or truck of which he was the driver.

The accident occurred on July 7, 1911, near Goodrich street, in the city of Grand Rapids, in defendant's yard, at a point where the car which was being unloaded stood on a side track beside a derrick, which was maintained there to facilitate loading and unloading cars. The car had recently arrived with a load of steel trussing for use in a large building called the Furniture Temple, which was being erected by Hoertz & Son, a firm of building contractors, who had ordered the material, and to whom the car was consigned. The car was hauled to Grand Rapids over the Lake Shore & Michigan Southern Railway from Rochester, Ind., and switched to defendant's tracks after its arrival, by order of Hoertz & Son, and spotted at the derrick for convenience in unloading. Defendant's connection with the car was to spot it at the derrick where it was to be unloaded by the consignee. Defendant received no compensation in connection with it beyond ordinary switching charges. It being a car load lot, the unloading devolved upon Hoertz & Son, the consignees. They employed a trucking firm named Golden & Boter to haul the steel

from the car to where they were engaged in erecting the building for which the trussing was intended. The unloading was directly in charge of and being done by a man named Steward, employed and sent for that purpose by Hoertz & Son. A man named Brandau, in defendant's employ, operated the derrick by which the trusses were lifted from the car and swung to the wagon or truck as Steward directed. Plaintiff was employed by Golden & Boter as a teamster. His duties consisted of driving the team which hauled the wagon to which the truss by which he was injured was transferred from the car by the derrick.

The three men thus connected with the unloading were each in separate employment; Steward being an employee of Hoertz & Son, Brandau of defendant, and plaintiff of Golden & Boter, the transfer firm. The derrick, which belonged to defendant, was of ordinary construction, and operated by electric power. It stood upon a concrete platform adjacent to the track and, generally stated, consisted of an upright post with a movable arm or crane extending from it, along which cables passed to and over the outer end from a drum at the foot of the post. Under the outside end of the arm, at the extremity of the cable, was a pulley to which was attached a large hook extending downward. The arm or crane was raised and lowered and swung from side to side by the mechanism of the derrick as the operator manipulated it.

In handling commodities with the derrick, a so-called "hand chain" was attached to the hook at the outer end of the arm and put around the articles to be moved. It is the claim of plaintiff that hand chains were a necessary part of the outfit of the derrick to be furnished by defendant as circumstances required. This is denied by defendant; the claim being that, while it had its own chains used by its employees in unloading less than car load lots, which devolved on

the carrier, chains were always furnished by consignees of full cars, who took charge of them on their arrival, and did their own unloading.

On the morning of July 7th, plaintiff was sent to the derrick by Golden & Boter with the wagon to draw the steel to the Furniture Temple, and Steward was sent there by Hoertz & Son to unload the car which had been placed on the track at the derrick the night before. The trusses were large triangular pieces of structural steel; the weight of each piece or section being some 1,600 or 1,800 pounds. The car load consisted of a dozen of these pieces.

Steward brought no hand chains, and it is plaintiff's contention that he was not expected or required to do so. On his arrival at the car, he asked Brandau, the operator of the derrick, for a hand chain, and, after some discussion, obtained one. It is the claim of Brandau that defendant had in a box four chains kept for its own use, and, when Steward asked for one, Brandau first asked him where his own chains were, and, being answered that Steward did not have any, he finally permitted him to take one from the box, and Steward selected the one he desired from the four. Steward testified that Brandau, when asked for a chain, could only find the one which was used; that it was very heavy and cumbersome, and he protested, but was told by Brandau he would have to use that if he used anything; that he objected because there did not appear to be as much angle in one of the hooks to the chain as there should be, and it was unnecessarily heavy to lift and use; that he realized the hook was not just right, and possibly the result might be unhooking or slipping. This hand chain consisted of an iron ring with two chains attached, having a hook at the lower end of each chain. The only charge of negligence against defendant relates to one of these hooks, which, it is claimed, was part of the equipment

of the derrick furnished by defendant to do the work, and was defective.

Plaintiff was the teamster, and had nothing to do with the unloading, except to drive the wagon to the car and care for his team until he had a load. On his arrival he placed his wagon at a proper position near the car, and looked after his horses, while Steward proceeded with the unloading. In doing this he put the ring of the hand chain he had obtained upon the hook under the pulley at the end of the arm of the derrick, and attached the chains around the truss, fastening them with the hooks. The first truss was safely transferred from the car to the wagon. The second truss fell while being swung, and injured plaintiff. After the accident, this second truss was placed upon the wagon with the same chain, but another and longer chain was used in unloading the remaining trusses.

Each truss stood upright in the car, with the longest side of the triangle resting upon the floor. In loading the wagon, the trusses were placed flat on the bolsters, which were about 3½ feet above the ground; it being a truck wagon, the top of the wheels were about the same height. In the process of unloading, each truss was first lifted from the car with the chains attached to the top piece and lowered until it lay flat on the ground. The chains were then readjusted so as to raise it flatwise and thus lay it upon the wagon. While this second truss was being raised from the ground, after being lifted out of the car and the chains rearranged, it did not exactly balance. Steward was standing at one end of it, and plaintiff at one side opposite the wagon, Brandau standing by the derrick operating it as indicated to him by Steward. As the truss was raised to swing it over upon the wagon, and Steward, holding at the end, was apparently having some trouble in keeping it balanced, plaintiff took a crowbar and pushed with it against the truss. Just

as he did so, the chain loosened, and the truss fell upon and injured him. Only Steward, Brandau, and plaintiff witnessed the accident.

Steward, a witness for plaintiff, testified that during almost all the time until the accident plaintiff was near his team looking after them, but was standing back more watching the operation than anything else as the truss which fell was being raised, and says:

"At this time, just as we saw the piece of steel start to swing, he made a jump to assist in pushing the other end back. * * * I cannot tell what it was that he took in his hand, a bar of some kind, and reached up as the steel was higher. I was pushing one end, and the other end shot up in the air. He picked up something and used a rod to reach the other end to push against it. * * * Just about that time the chain unhooked and fell."

Witness further stated that the end which he had hold of was nearer the ground when the truss fell, and it struck first on the east side, which was the heaviest, then down on the west side, which caught plaintiff; his head and neck being under the truss, and his feet and body out.

Plaintiff testified that, as they raised the piece, it hung with one end higher than the other, Steward having hold of the front or low end, lifting up; that, not being able to reach the other end with his hand, plaintiff took a crowbar to assist in swinging it over, and was "kind of pushing and swinging it over the wagon;" that it was about over the wheels, and had to be shoved about four inches before it could be let down, when "I just had a breath that the beam was top of me and then I passed away; I didn't know nothing. * * * It struck me on the right side at the top of the head."

Brandau, a witness for defendant, testified that he was operating the derrick in response to a signal to raise, and—

"When I looked up Mr. Shadduck had a crowbar in his hand, and shoved her on that point, and I looked around to see how she was coming, and, as I looked around, the crowbar was between the hook and the chain, and I gave a yell out of me, shut down the machine, and before the machine was shut down, in fact before the wind was out of my mouth, the piece came down.  *  *  *  When I first saw him was when he had the crowbar up against or in the chain; then I hollered."

Plaintiff, being recalled as a witness, denied that he put the crowbar between the hook and chain, or touched the chain with the crowbar.

Plaintiff was at once taken in a practically unconscious condition to a hospital, and cared for by a physician, who testified that an examination disclosed four of plaintiff's ribs fractured, a wound in his back penetrating the lung, bruises with discoloration extending from the knee over his hip along the back to his shoulder, and a scalp wound on his head. At the end of 15 days plaintiff was able to leave the hospital, staggering with a cane, as he testified, out to a hack which took him to the train by which he went to his former home at Cedar Springs. After leaving the hospital, he had no further medical attendance, so far as shown. The doctor who attended him when first injured states that he did not see him again after he left the hospital until October 26, 1912, when he called at the office shortly before the trial to "get a statement," or "give a statement to me of his condition." The extent and permanency of his injuries were issues of fact in controversy in the case.

In our view of this case, the important and controlling question raised in defendant's numerous assignments of error is whether, under the undisputed evidence, there was any issue of fact to be submitted to a jury. This question is presented and preserved by proper motions, and requests to charge on the sub-

jects of defendant's negligence and plaintiff's contributory negligence and exceptions timely taken.

In this State the burden of proof on both defendant's negligence and plaintiff's freedom from contributory negligence rests upon the plaintiff.

The contention that hand chains were not a necessary part of the equipment of a derrick which it was the duty of the defendant to furnish is of minor importance here. While it can well be said that the derrick, as such, was complete for handling all articles within the scope of its capabilities, which might in any manner be attached to the hook on the pulley at the end of the cable on its arm, and many things could be securely attached by other means than chains, it is undisputed that chains were kept and used for that purpose, and were furnished by defendant on the day in question. Whether it was customary for the consignee of car load lots, whose duty it was to unload, to furnish its own chains was a matter in dispute. For the purpose of the present inquiry, it may be assumed it was not.

While there is some difference between Steward and Brandau as to what was said, Steward knew there were other chains than the one he used. He says: "The one we had used was not there." They searched for it, but did not find it. Brandau said he guessed they would have to use that one if they used any, and they did. The chain was strong and sufficient for the proposed duty, if properly attached. Steward's complaint was not only as to the hook, but that the chain was unnecessarily heavy. He saw the condition of the hook and questioned it, but took the chain and made the attachments as he saw fit. Knowing and understanding the condition and possible insecurity of the hook, it was incumbent on him to exercise commensurate care. Defendant had no control over the manner in which he used the chain. It was a simple ap-

pliance which could be attached in various ways, as could a rope, with or without hooks or rings. It was possible to fasten it adequately, and it did handle two pieces of trussing that morning, being attached and detached twice each time. The only time it failed was when plaintiff pushed and swung it with a crowbar. If the giving way at that time was not caused by plaintiff's crowbar, it could well be attributed to Steward's negligence in fastening the chain, he being in charge of the unloading, with full authority to decide in what manner the work should be done, and how the chain should be fastened.

Plaintiff was not in defendant's employ nor under its control. It owed him none of the duties of a master to a servant. He was in the employ of Golden & Boter, who were in the employ of Hoertz & Son, who were not in defendant's employ, but were engaged in unloading their own material from a car in defendant's yard. Plaintiff was there as a teamster; he was not there to unload the car. That duty devolved upon Steward. They were not fellow-servants. 1 Shearman & Redfield on Negligence, §§ 181-225; *Kastl* v. *Railroad Co.*, 114 Mich. 54 (72 N. W. 28).

According to the testimony of Steward, who was plaintiff's witness, plaintiff was, for most of the time before the accident, engaged in the line of his duties, caring for his team. Just before the accident, he was standing back watching the operation of unloading. The act which led him into danger was outside of the line of his employment, as a volunteer, sudden and unexpected to those doing and in charge of the work, without request or instruction, or time for them to give him warning.

Plaintiff was 41 years of age, of apparently average intelligence, and with 12 years' experience in using and fastening chains in heavy lifting, pulling stumps and clearing land. He states that he paid no attention to the condition of this chain, and did not know

how it was fastened. Yet he put himself under the heavy, swinging truss, 30 to 40 feet long, and weighing 1,800 or 2,000 pounds, as he testified, being raised by this chain and hanging so high above his head that he could not reach it with his hands, and there proceeded to "kind of push and swing it" with a crowbar. In taking this manifest position of danger, and thus exposing himself to unnecessary and obvious risks, he failed to exercise that degree of ordinary care and prudence which a discreet and cautious individual and the great mass of mankind would, or ought to, observe under like circumstances.

"Contributory negligence, in its legal signification, is such an act or omission on the part of a plaintiff, amounting to a want of ordinary care, as, concurring or co-operating with the negligent act of the defendant, is a proximate cause or occasion of the injury complained of. To constitute contributory negligence there must be a want of ordinary care on the part of the plaintiff, and a proximate connection between that and the injury." Beach on Contributory Negligence, § 7.

To negligently put one's self in a place of danger is a proximate, concurring cause of an injury then and there following; for, whatever the negligence of the defendant, the injury could not have been sustained if the plaintiff had not been careless and neglectful in guarding his own safety.

There were no contract relations between defendant and plaintiff. He was a third party. Defendant's alleged negligence in furnishing the defective chain complained of to Hoertz & Son was but a remote cause of plaintiff's injuries, which were received while the chain was being used by Steward. The use then made of it by Steward and his manner of using, together with plaintiff's conduct in exposing himself at that time, were the direct, concurring, proximate causes of the injury. Between the remote cause and the injury

there was an intervening, independent, controlling human agency acting with full knowledge of the visible defect, and which, with that knowledge, might have prevented the accident. In such case the owner is not answerable to a third person by reason of the use of a leased or loaned defective article by one over whom he has no control. *Fowles* v. *Briggs*, 116 Mich. 425 (74 N. W. 1046, 40 L. R. A. 528, 72 Am. St. Rep. 537) ; *Griffin* v. *Power Co.*, 128 Mich. 653 (87 N. W. 888, 55 L. R. A. 318, 92 Am. St. Rep. 496).

For the foregoing reasons, we are impelled to the view that the judgment must be reversed, and no new trial granted.

MCALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER BIRD, and MOORE, JJ., concurred.